## ORIGINAL

1  Ross B. Brooks (N.Y. Bar No. 922122)
   Russell L. Kornblith (CA Bar No. 289329)
2  SANFORD HEISLER KIMPEL, LLP
   1350 Avenue of the Americas, 31st Floor
3  New York, NY 10019
   Tel.: (646) 402-5650
4  Fax: (646) 402-5651

5  Edward D. Chapin (CA Bar No. 53287)
   SANFORD HEISLER KIMPEL, LLP
6  501 West Broadway, Suite 515
   San Diego, CA 92101
7  Tel.: (619) 577-4253
   Fax: (619) 577-4250
8
   David W. Sanford (D.C. Bar No. 457933)
9  SANFORD HEISLER KIMPEL, LLP
   1666 Connecticut Avenue, N.W., Suite 300
10 Washington, D.C. 20009
   Tel:    (202) 499-5200
11 Fax:    (202) 499-5199

12 *Attorneys for Plaintiffs*

13

14                  **UNITED STATES DISTRICT COURT**

15               **SOUTHERN DISTRICT OF CALIFORNIA**

16

17                                        **16CV0643  H  BLM**

18 UNITED STATES OF AMERICA,        ) CIVIL ACTION NO.
                                    )
19 and                             )
                                    )
   THE STATE OF CALIFORNIA,         ) **COMPLAINT**
20                                  )
   *EX REL.* [UNDER SEAL],          )
21                                  ) **FILED UNDER SEAL**
            Plaintiffs,             ) **PURSUANT TO**
22                                  ) **31 U.S.C. § 3730(b)(2)**
   v.                               )
23                                  )
   [UNDER SEAL],                    ) **JURY TRIAL DEMANDED**
24                                  )
            Defendant.              )
25                                  )
                                    )
26                                  )
                                    )
27                                  )

28

                                     1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA; and THE STATE OF CALIFORNIA, *ex rel.* SUZANNE FORREST,<br><br>      Plaintiffs,<br><br>v.<br><br>SCRIPPS HEALTH,<br><br>      Defendant. | CIVIL ACTION NO.<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.; and* CALIFORNIA FALSE CLAIMS ACT, CAL. GOVT. CODE § 12650 *ET SEQ.***<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>JURY TRIAL DEMANDED |

## I.     **INTRODUCTION**

1.      This is a *qui tam* action by Plaintiff-Relator Suzanne Forrest ("Relator"), for herself and on behalf of the United States and on behalf of the sovereign state of California, to recover damages and civil penalties arising from Defendant Scripps Health's actions in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and the California False Claims Act, Cal. Gov't Code § 12650, *et seq.*

2.      As set forth more fully below, Defendant's unlawful conduct included: (1) billing for services performed by unsupervised non-physician personnel; (2) billing for services performed by unsupervised resident physicians; (3) upcoding for non-billable services performed on the same day as a billable service; (4) billing for non-billable history and physical visits; (5) altering medical diagnoses to ensure reimbursement; (6) billing for diabetes treatment on behalf of patients lacking the requisite diagnostic criteria; and (7) billing for physician services lacking adequate corresponding documentation.

3.      As a result of Defendant's billing practices, government healthcare programs approved, paid, and continue to approve and pay, claims under Medicare and Medi-Cal that they otherwise would not approve or pay if not for the fraudulent conduct of Defendant.

4.      Moreover, although Relator repeatedly put Defendant on notice that it had been fraudulently overbilling these government payors, Defendant has taken no steps to return or refund the fraudulently obtained monies.

5.      Eventually, Defendant sought to silence Relator by threatening her with termination if she did not acquiesce in Defendant's continuing unlawful conduct. Relator was, therefore, forced to resign.

## II.     **PARTIES**

6.      **Defendant Scripps Health** ("Scripps," "Scripps Health," or "Defendant") is a nonprofit healthcare system headquartered in San Diego, California. Scripps includes four hospitals and 19 outpatient facilities. According to its 2014 annual report, Scripps had revenue of $2.56 billion and assets totaling nearly $4.3 billion.

7.      **Relator Suzanne Forrest** is a citizen of the United States and a resident of California. Until November 1, 2015, she was the Director of Business Operations at Scripps Health. Ms. Forrest holds or has held numerous certifications relevant to Medicare coding. These certifications include Certified Coding Specialist, Certified Coding Specialist – Physician-based,

Certified Professional Coder, Registered Health Information Technician, Registered Health Information Administrator, AHIMA Approved ICD-10 Instructor, and Healthcare Compliance.

8.     Relator Forrest has more than thirty years of experience in medical billing, coding, and compliance. Prior to her position at Scripps Health, Relator worked as the Manager of the Compliance Program at the University of California, San Diego Health Sciences from August 1998 through June 2015. Because of her expertise, Ms. Forrest has also taught CPT coding at the San Diego Mesa Community College and Stephens College, and has conducted over a dozen speaking engagements regarding CPT coding.

9.     As the Director of Business Operations at Scripps Health, Relator has direct and personal knowledge of the allegations described herein. Among other things, the Business Services group is responsible for processing physician claims. On Relator Forrest's information and belief, there are approximately 200 employees in Business Services.

10.     Relator Forrest was supervised by Tammy Gaines, the Senior Director for Business Services ("Senior Director Gaines"). Relator Forrest's duties involved, among other things, overseeing edits to Centers for Medicare & Medicaid Services ("CMS") claims, provider education, coding quality assessments, and monitoring staff productivity. One major aspect of her position involved the supervision, management, and education of approximately 50 staff, including Provider Relations Staff and biller/coders. Provider Relations Staff are responsible for conducting reviews of submitted claims, comparing billing codes to the provider's documentation, and providing feedback to providers. These staff also inform providers of any new regulations that may influence their billing and claims. Biller/coders are in charge of applying modifiers to physicians' CPT coding as needed, including when an account "hits an edit," meaning that the system requires some correction of the codes. Throughout all of this, Relator Forrest was expected to keep Senior Director Gaines and Jan Coughlin, the Director of Compliance ("Director Coughlin"), abreast of these and any other compliance and billing issues. Because of her responsibilities, Relator Forrest was privy to the billing and regulatory compliance practices of Scripps Health on a large scale and constant basis.

## III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under the False Claims Act, 31 U.S.C. §§ 3729 and 3730, and

parallel provisions of the California False Claims Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

12.    This Court has personal jurisdiction over Scripps Health because 31 U.S.C. § 3732(a) authorizes nationwide service of process and because Defendant has at least minimum contacts with the United States. Moreover, Defendant is headquartered in, can be found in, and transacts—or has transacted—business in the Southern District of California.

13.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendant can be found in and transacts—or has transacted—significant business in the Southern District of California, and many of the acts forming the basis of this action occurred within the District.

14.    In conformity with 31 U.S.C. § 3730(b)(2), Relator Suzanne Forrest has served a written disclosure of all material evidence and information in her possession on the United States Attorney General and the United States Attorney for this District. This written disclosure will be supported by material evidence known to Relator at the time of filing this Complaint establishing the existence of Defendant's fraudulent conduct, which resulted in economic loss to the Government. Because the information includes attorney-client communications and work product of Relator's attorneys, and will be submitted to those Federal and California officials in their capacity as potential co-counsel in the litigation, Relator understands her disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

15.    There has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. *See* 31 U.S.C. § 3730(e)(4). Assuming there had been such a disclosure, Relator Suzanne Forrest is an "original source" under the FCA and parallel provisions of the California False Claims Act. *Id.*

## IV.    LEGAL AND REGULATORY FRAMEWORK

### A.    The False Claims Act

16.    The False Claims Act ("FCA") was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the United States Government's tools for recovering losses sustained from the perpetuation of fraud against the American taxpayer. The amendments were intended to create incentives for people with knowledge of frauds against the Government to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit resources to prosecuting

fraud on the Government's behalf. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the government and private Relators' burdens in investigating and prosecuting *qui tam* suits under the FCA.

17.     The FCA allows any person having information about false or fraudulent claims to bring an action for herself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on Scripps Health during that time) to enable the Government to (a) conduct its own investigation without Scripps Health's knowledge and (b) determine whether to join the action.

18.     Additionally, the California False Claims Act allows a person having information about false or fraudulent claims to bring an action on behalf of herself and the state of California. Relator brings this action on her own behalf, along with that of the United States and the State of California.

**B.     The Medicare Program**

19.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third-party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C. §§ 1395 *et seq.* Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund. Medicare Part A covers hospital services. Medicare Part B generally covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis. Part B, 42 U.S.C. §§ 1395j *et seq.* and 1395l (payment of benefits). Physicians, non-physician practitioners, and other health care suppliers must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

20.     In order to enter into a Provider Agreement authorizing them to provide services to Medicare beneficiaries, all providers must submit an enrollment application to the program on its Form CMS 855A. Among other things, the application requires providers to sign a certification that states in relevant part:

Section 15: CERTIFICATION STATEMENT

A. Additional Requirements for Medicare Enrollment

…

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions

are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

…

6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Medicare Enrollment Application, Institutional Providers, CMS – 855A.

21.     Form CMS 855A must be resubmitted every five years, to verify the accuracy of enrollment information, or any time there is a change in the information provided on the form. 42 CFR § 424.515.

22.     All providers that submit Medicare claims electronically to CMS must certify in their application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." *See* Medicare Claims Processing Manual, § 30.2.A.

23.     All providers must also contemporaneously create and maintain accurate medical records that support the providers' claims for reimbursement. *See, e.g.,* CMS MLN Matters Number: SE1022 ("Providers/suppliers should maintain a medical record for each Medicare beneficiary that is their patient. Remember that medical records must be accurately written, promptly completed, accessible, properly filed and retained.").

24.     For inpatient treatment, reimbursement to treating facilities (such as hospitals) is governed by Medicare Part A, 42 U.S.C. §§ 1395c-1395i-5. For outpatient treatment, reimbursement to health care providers (such as physicians) is governed by Medicare Part B, 42 U.S.C. §§ 1395j-1395w-5.

C.     **The Medicaid Program**

25.     Medicaid is a federally-funded and state-funded health program, benefiting "categorically eligible" people, who are primarily low-income individuals and families. Like Medicare, it was created in 1965 pursuant to Title XIX of the Social Security Act. Under Medicaid, participating states administer state Medicaid programs that subsidize health care

7

coverage for eligible residents. The individual state programs reimburse medical providers and hospitals for services rendered to program participants. The states receive federal funds to pay for Medicaid services.

26. Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396(a)(1)(A), 42 U.S.C. § 1396d(a)(1-)(2), and uses a cost reporting method similar to that used under Medicare.

27. Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions.

28. Similar to Medicare coverage requirements, medical services must be reasonable and medically necessary in order to be subsidized by Medicaid. Claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification. These terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws.

**D. TRICARE/CHAMPUS**

29. In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

30. In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1).

31. Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

32. TRICARE's governing regulations, like Medicare's and Medicaid's requirements also are based upon "medical necessity." TRICARE's governing regulations require that services

provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. § 199.6(a)(5). In this respect, similar to Medicare and Medicaid, services provided at a level higher than is medically necessary are improper and violations of TRICARE. *Id.*

## V.   DEFENDANT'S UNLAWFUL CONDUCT

33.     Throughout her time at Scripps, Relator Forrest personally observed an array of fraudulent schemes. These schemes, both individually and together demonstrate deliberate indifference and recklessness towards, as well as knowledge of, widespread violations of Medicare, Medi-Cal, and TRICARE billing requirements. In each case, the violations of payment guidelines resulted in Scripps collecting government reimbursements to which it was not entitled. When Relator Forrest sought to warn Scripps of its widespread non-compliance, her warnings were not heeded and instead were deliberately ignored. Eventually, the calls for silence became deafening. Faced with a threat of termination if she continued to blow the whistle on Scripps's widespread illegal conduct, Relator Forrest was forced to resign.

### A.  Violations of the "Incident to" Rule

34.     While at Scripps, Relator Forrest learned of widespread violations of Medicare's so-called "incident to" rules governing clinical treatment. Under these rules, a physician must be present when a service is billed "incident to" her or his care. In such cases, the provider is permitted to bill for the service under his or her own Medicare provider number (and Medicare certifications). If the physician is not present, then in order for the services to be reimbursable, they must be submitted under the provider number of the provider who actually provided the service.

35.     "Incident-to services are a program vulnerability in that they do not appear in claims data and can be identified only by reviewing the medical record. They may also be vulnerable to overutilization and expose beneficiaries to care that does not meet professional standards of quality." Office of Inspector General Work Plan, Fiscal Year 2013, U.S. Department of Health & Human Services.

36.     The Medicare Coverage Manual provides that "Physician assistants, nurse practitioners, clinical nurse specialists, certified nurse midwives, clinical psychologists, clinical social workers, physical therapists and occupational therapists all have their own benefit

categories and may provide services without direct physician supervision and bill directly for these services. When their services are provided as auxiliary personnel under direct physician supervision, they may be covered as incident to services, in which case the incident to requirements would apply." (§ 60.A)

37.     The Manual further explains that "To be covered incident to the services of a physician or other practitioner, services and supplies must be . . . Furnished by the physician or by auxiliary personnel under the physician's direct supervision." Direct supervision, in turn, is defined as follows: "Direct supervision in the office setting does not mean that the physician must be present in the same room with his or her aide. However, the physician must be present in the office suite and immediately available to provide assistance and direction throughout the time the aide is performing services." *See also* Physical, Occupational, and Speech Therapy Services, Centers for Medicare & Medicaid Services, Jan 5, 2012, *available at*: https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medical-Review/Downloads/TherapyCapSlidesv10_09052012.pdf; Report to Congress: Standards for Supervision of Physical Therapist Assistants (PTAs) and the Effects of Eliminating the "Personal" PTA Supervision Requirement on the Financial Caps for Medicare Therapy Services, available at: https://www.cms.gov/medicare/billing/therapyservices/downloads/61004ptartc.pdf; *United States v. Prince*, 618 F.3d 551, 556 (6th Cir. 2010); *Hand Rehabilitation Ctr. v. Workers' Comp. Appeals Bd.*, 34 Cal. App. 4th 1204, 1212 (Cal. App. 4th Dist. 1995).

38.     Services provided in an outpatient setting are submitted to Medicare through Part B on an HCFA 1500 Form and signed electronically by the provider. That form includes the following certification:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

> For services to be considered "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

39.     At Scripps, however, claims are submitted for physical therapy services provided by auxiliary personnel, including physical therapists, under the physician's provider number; that is, under the guise that the services were provided under the physician's direct supervision, when,

1    in fact, the physicians were often not present when the services were provided.

2        40.    Relator Forrest determined that as a matter of policy, Scripps required only that
3    physicians be available by telephone, and not on site, as the Medicare Coverage Manual required.
4    Moreover, she learned that physical therapists at Scripps could not bill directly for services that
     they provided, because they do not have Medicare provider numbers of their own. Instead, all
5    physical therapy services were billed as incident to physician services, regardless of the
6    physician's presence in the suite.

7        41.    Relator learned of these systemic violations through an email chain. On September
8    2, 2015, Senior Director of Finance Jeremy Church ("Director Church") wrote to Senior Financial
9    Analyst Dimtry Kutsenko ("Analyst Kutsenko") to say that "Dr. Walker's wRVUs in Physical
10   Therapy BAN are unusually [high]. We should reach out to Provider Relations on that." Relative
     Value Units, or RVUs, are a measure of Medicare reimbursement value for physician services. In
11   other words, Director Church observed that Dr. Walker was billing an unusually high amount of
12   physical therapy under his provider number.

13       42.    Analyst Kutsenko in turn contacted Provider Relations Analyst Kathryn Stanley,
14   who inquired whether a computer change might be responsible for the billing change. Eventually,
15   Scripps personnel determined that Dr. Walker's unusually high billing for physical therapy
16   services was the result of a computer programming action within GE's Centricity Business
     system, the system used to electronically submit the Medicare Form 1500 discussed above.
17   Programmers had implemented a script that would "change the provider to Walker if the provider
18   of service on the encounter = PHYSICAL THERAPIST." In other words, any patient receiving
19   any physical therapy, provided by any physical therapist was being billed under Dr. Walker's
20   provider number.

21       43.    When Relator Forrest received this email chain, she emailed Kelly Bauer, Manager
22   of the biller/coders ("Manager Bauer"), on September 17, 2015, to inquire as to whether Dr.
23   Walker had been on site for these billings. Manager Bauer informed Relator Forrest later that day
     that Dr. Walker was not, in fact, on site.
24
25       44.    Relator Forrest subsequently learned that Scripps personnel had conducted
     meetings on its lack of compliance in this regard. Relator Forrest learned from Director MaryAnn
26   Wingrove that Senior Director Gaines had called an ad hoc meeting on or around December 6,
27   2015, to discuss the issue. Yet, rather than remedy the problem, Scripps personnel had been
28   instructed to search for a loophole.

45.     Moreover, Scripps cannot comply with the incident to rules by billing for services under the provider numbers of the physical therapists because, as discussed above, physical therapists at Scripps do not have separate Medicare provider numbers.

46.     Relator Forrest estimates that this practice had been commonplace at Scripps for years, and, as a result Scripps Health has retained substantial government funds submitted by Scripps providers for care for which Scripps was ineligible for reimbursement.

47.     In addition, despite repeated warnings by Relator Forrest, Scripps has not returned any of the reimbursements wrongfully claimed by physicians.

### B. Violations of Medicare's Teaching Physician Rules

48.     Relator also knows that Scripps has a widespread practice of billing Medicare for services provided by medical residents outside the presence of attending or treating physicians.

49.     The Medicare Claims Processing Manual, Chapter 12, § 100.1, instructs that, pursuant to 42 C.F.R. § 415.270, Medicare provides for reimbursement of services provided by a resident only when the teaching physician was physically present during the critical or key portions of the service.

50.     Furthermore, the Medicare Claims Processing Manual, Chapter 12, § 100.1.1(A) clarifies that "[f]or purposes of payment, [Evaluation and Management] E/M services billed by teaching physicians require that they personally document at least the following:

• That they performed the service or were physically present during the key or critical portions of the service when performed by the resident; and

• The participation of the teaching physician in the management of the patient."

The Manual also specifies one further exception not applicable here. If the underlying procedure does not meet *all* criteria under the descriptor, the provider must bill under a less comprehensive code.

51.     In spite of this limitation, Scripps personnel regularly submitted claims for services performed by residents without even documenting the presence of the attending physician.

52.     Relator Forrest learned of this practice while doing a review of claims submitted with the GC Modifier ("GC Report"). The GC modifier indicates that services for a claim were performed in part by a resident. At Scripps, the Compliance team circulates the GC Report on a monthly basis between Compliance and Business Services. The GC Report contains particularized details of the individual transactions at issue.

53.     Relator Forrest reviewed the GC Report and compared it to the physicians' notes on several patients. Based on this review, Relator Forrest determined that approximately six out of 10 physicians had billed for claims that showed no documentary evidence of the presence of an attending physician. Based on this cursory review, Relator believes that Scripps was submitting approximately 500 false claims per month for services performed by a resident without documentary evidence of the presence of an attending physician.

54.     Relator Forrest informed Senior Director Gaines of this ongoing fraud via email on August 25, 2015 and attached a spreadsheet containing the GC Report. Senior Director Gaines, however, never responded to Relator's email.

55.     Relator Forrest also informed Director Coughlin and Senior Director Gaines of this ongoing lack of compliance at an in-person meeting in or around September 2015. Nonetheless, so far as Relator is aware, Scripps never took action to correct this ongoing lack of compliance or to refund reimbursements that had been fraudulently obtained.

## C. Upcoding Through Unwarranted Coding of Modifier 25

56.     The Medicare and Medi-Cal programs reimburse medical procedures based on the Current Procedural Technology ("CPT") codes. Each CPT code describes a set of medical, surgical, and diagnostic services as defined by the American Medical Association ("AMA"). When a physician or hospital submits a CPT code to Medicare or to Medi-Cal, she or he is stating that she or he performed the services designated by the code.

57.     In addition to CPT codes, the AMA also provides certain modifiers that identify additional services that a physician may provide in addition to those identified by the underlying CPT code. Generally speaking, modifiers indicate some billing alteration or clarification of the CPT code, and were designed by CMS to promote accurate coding by providers and to prevent Medicare payment for improperly coded services.

58.     Typically, at Scripps, modifiers are added by biller/coders at the end of the claim submission process. This process begins when a physician makes note of the services that she or he performed in the hospital's electronic medical records system, Allscripts. When the physician's note is complete, the physician then adds the diagnosis code(s) and submits it in Allscripts. The account, including the intended billing code, then enters a biller/coder's work queue. The biller/coder then determines whether the codes are appropriate and adds any modifiers. Once the biller/coder completes this process, the account is released into Scripps's GE Centricity Business system, which, in turn, submits the claim to the Government for payment.

59.     Modifier 25 was established to facilitate the reporting of evaluation and management (E/M) services on the same day as a procedure for which separate payment may be made. In order for the E/M service to be separately reimbursable, however, the service must be significant enough so as to necessitate independent assessment of a distinct problem or condition.

60.     As pertinent here, Modifier 25 connotes a "significant, separately identifiable evaluation and management [E/M] service by the same physician on the same day of the procedure or other service." Medicare gives the following example of a "significant, separately identifiable" E/M service: "A patient reports for pulmonary function testing in the morning and then attends the hypertension clinic in the afternoon. The pulmonary function tests are reported without an E/M service code. However, an E/M service code with the modifier –25 appended should be reported to indicate that the afternoon hypertension clinic visit was not related to the pulmonary function testing." Department of Health and Human Services, Health Care Financing Administration, Program Memorandum Intermediaries, Transmittal, No. A-00-40 (July 20, 2000).

61.     Thus, the proper billing of a surgical procedure and a legitimate E/M service would be a billing for the procedure and a separate line item for the E/M service accompanied by the Modifier 25 code. Absent the Modifier 25 code, the services beyond the surgical service are not separately compensable by government health insurance. That is, the Modifier 25 results in a higher reimbursement because it signifies that the additional service provided is both significant and separately identifiable. *See United States v. Poulin*, 461 Fed. App'x 272, 281 (4th Cir. 2012).

62.     Scripps Health coders, however, frequently add Modifier 25 even when no significant, separately identifiable E/M service is being performed. Relator noticed the high use of Modifier 25 shortly after she began work at Scripps Health. Based on her anecdotal observations, Relator estimated that in approximately 35% of CPT submissions, staff had added Modifier 25.

63.     Relator ordered a review of those physicians with the highest use of Modifier 25 around August 2015. Dr. Christopher Bergeron was included in the Modifier 25 billing review as having a high utilization of the Modifier. The review showed that approximately 10% of Dr. Bergeron's Modifier 25 billings were erroneous, meaning that biller/coders had coded Modifier 25 when the service receiving the code should in fact have been included within the surgical package connoted by the underlying CPT code.

64.     On October 13, 2015, Sonja Crouch, a Provider Relations Analyst, wrote to Dr. Bergeron to so inform him. Dr. Bergeron responded that he did not enter the modifiers, but instead "modifiers are appended by the biller coders. . . . I have not done that since my arrival

here nearly 5 years ago so this is likely a coder issue as well."

65.    Relator Forrest then sought to understand why coders were improperly inputting Modifier 25 on a large scale. On October 16, 2015, Relator Forrest wrote to Lyn Perez, a coder ("Coder Perez"), to ask about several cases where Coder Perez had used Modifier 25 even though the physician had not performed a "significant, separately identifiable evaluation and management [E/M] service." Relator Forrest then identified three transactions: The first concerned a patient, date of service 2015, provided by Dr. Gilbertson; the second concerned a patient, date of service 2015, provided by Dr. Izadpanah; and the third concerned a patient, date of service 2015, provided by Dr. Saekow.

66.    Coder Perez responded as follows: "I am sure there are a lot more encounters that have a procedure and an E&M billed together. I am also sure that the E&M on some of those bills should not have been billed. There are quite a few providers that pad their bill. It is an ongoing problem."

67.    Also on October 16, 2015, Relator Forrest contacted Katie Salas, another coder ("Coder Salas"). Relator Forrest identified six transactions in which Coder Salas had added the Modifier 25 code, two of which were not supported by documentation and four of which did not warrant the addition of the code. Relator included a screen shot from Allscripts of some of the additions. The first transaction took place in 2015, was provided by Dr. Michael Thompson to a patient, and concerned the CPT code 99212 with Modifier 25 as well as CPT codes 29075 and Q4010. The second transaction took place in 2015, was provided by Dr. Thompson to a second patient, and concerned the CPT code 99213 with Modifier 25 as well as CPT codes 20605 (entered twice), 215936, J3301, and 9710. In addition, Relator Forrest identified a transaction for a third patient, provided by Dr. Thompson and three transactions by Dr. Thorne to three different patients, all provided in 2015.

68.    In response, Coder Salas explained as follows:

> I added the MOD 25 because that is how we have been trained and program to do. If the E&M is provided just add the MOD 25 and submit. Don't ask any questions or read any documentation if you don't need to. On this one I just added and submitted the charge.

69.    The next week, Relator Forrest wrote to Teresa Bellez, Supervisor of the biller/coders ("Supervisor Bellez"). Relator Forrest asked Supervisor Bellez "when the biller coders are working edits and there is an E/M and procedure what is the expectation/procedure that they do?" Supervisor Bellez responded that the coders "have been instructed to add the

modifier 25. As most of these are for level I coders there is no expectation that they need to verify that a separately identifiable visit was done in addition to the procedure. They are not expected nor have the tools to ensure the level of E&M submitted by the physician is quantified." In other words, even for services that are clearly part of the surgical package, biller/coders at Scripps were instructed to add the Modifier 25, which had the effect of increasing the reimbursement package.

70.     Based on this correspondence Relator Forrest concluded that Scripps had been knowingly or recklessly submitting claims for separately identifiable E/M services for some time. Relator so informed Senior Director Gaines and Director of Compliance Coughlin. Nonetheless, so far as Relator Forrest is aware, Scripps never took any action to return monies fraudulently obtained through the unwarranted use of Modifier 25.

### D. Overbilling for History and Physicals

71.     Relator Forrest soon learned that physicians had also been regularly overbilling for preoperative history and physical visits as well. On October 15, 2015, Relator Forrest arranged for a "Billing Services Brief" to be sent to all physicians at Scripps. The Brief explained a hypothetical billing scenario set out by the American Medical Association in which a decision is made to operate and, two weeks later, the patient returns for a history and physical visit on the eve of the operation. During the visit, the provider "spend[s] approximately 45 minutes with the patient answering all his/her questions." The bulletin concluded that "[t]his is not a separately billable service and should not be billed."

72.     The response of Scripps physicians was swift and highly contentious. For example, Dr. Salvatore Pacella responded: "The preop visit often requires 45 plus minutes of provider time . . . . why this free?" (sic) And Dr. Ross Rudolph responded that Ms. Forrest's message "is not what it says in the CPT book."

73.     Faced with a provider backlash, Senior Director Gaines ordered Relator Forrest to cease engaging. She emailed Relator Forrest stating, "[s]ince early yesterday morning I have been trying to undo the damage from this which has reached a new high within the organization as it has been sent to the CFO, physician leadership and likely the president of SMF."

74.     Nonetheless, Relator Forrest did receive one supportive email from Dr. Hugh Greenway, the Chairman of Mohs surgery and CEO emeritus of Scripps Clinic. Dr. Greenway wrote that "some of the people [who are] complaining the most appear to be those involved with post-op reconstruction of my MOHs cases where the finances are important to some more than others.." (sic) In other words, Dr. Greenway indicated that the desire to bill additional

preoperative visits was born of a desire to increase billings for certain practices.

75.     Based on these messages, Relator Forrest concluded that Scripps physicians had regularly been billing Government payors for visits on the day before surgery that should not have been separately compensable. Further, based on the foregoing responses, Relator Forrest also determined that none of these providers would be undertaking appropriate steps to refund monies obtained through wrongfully billed reimbursements.

### E. Altering Diagnoses

76.     Relator also observed that Scripps has a widespread practice of altering medical diagnoses to ensure payment.

77.     The GE Centricity system is designed to "hit an edit" whenever a provider submits a diagnosis that is not reimbursable by the intended Government payor. Hitting an edit means that rather than submitting the claim for payment, the system instead holds the claim in the biller/coder's work queue for review and/or revision.

78.     Relator learned that the hospital had a "Denials Committee," whose goal was to ensure that Business Services had a nearly 100% Medicare and Medi-Cal reimbursement rate. In conformity with this philosophy, Scripps expected that all codes that hit an edit would be modified to ensure payment.

79.     To facilitate this fraudulent scheme, whenever the GE Centricity system "hit an edit" informing the Scripps Provider Relations staff that a diagnosis was not covered, the Provider Relations Analyst was instructed by "Job Guides" created by Business Services to search for a list of covered diagnoses and then send it to the provider under the Orwellian guise of "educating the provider." The provider would then alter the diagnosis to one of the payable diagnoses and then resubmit the claim for payment.

80.     Relator saw this practice firsthand through an email chain concerning a patient ("Patient 1"). Patient 1's treatment in 2015 was initially submitted under the diagnosis code "Aneurysm of Artery of lower extremity," Code 172.4.

81.     This diagnosis, however, did not support the medical necessity, and therefore reimbursability, of the procedures performed. So, in order to obtain reimbursement, Provider Relations Analyst December Noble ("Analyst Noble") wrote to Dr. Ankur Chandra to explain that "[t]his diagnosis does not support medical necessity." Further she instructed, "[b]elow is a list of diagnosis codes that support medical necessity. Please review and submit the appropriate diagnosis to support services rendered. (Note: I've attached the LCD-Local Coverage

Determination from Medicare for your reference)." Finally, she instructed, "let me know that you've made the change in Allscripts."

82.     Upon information and belief, Dr. Chandra made the change as instructed by Analyst Noble, and the false claim was submitted to the government for payment.

83.     Relator believes that an analysis of the patient's charts will reveal that the appropriate diagnosis is the original aneurysm diagnosis.

84.     Relator further believes that this practice could be discovered on a large scale by looking at denial reports and then subsequent resubmissions on the same patient's account. Moreover, Relator believes that the AllScripts system contains an audit trail that will show when and who modified the diagnosis.

## F.  **False Diabetes Diagnoses**

85.     Similarly, Relator also observed that Scripps Health violated Medicare rules and guidelines by submitting false claims for diabetes treatment, when the patient did not in fact meet the necessary diagnostic criteria for diabetes.

86.     Medicare covers diabetes self-management training (DSMT). According to the Center for Medicare and Medicaid Services, DSMT includes "instruction in self-monitoring of blood glucose; education about diet and exercise; an insulin treatment plan developed specifically for the patient who is insulin-dependent; and motivation for patients to use the skills for self-management."

87.     In order for a claim for DSMT services to qualify for Medicare reimbursement, patients must meet CMS guidelines for a diabetes diagnosis. Section 300.1 of the Medicare Claims Processing Manual specifies the diagnostic criteria for diabetes:

- A fasting blood sugar greater than or equal to 126 mg/dL on two different occasions;

- A 2 hour post-glucose challenge greater than or equal to 200 mg/dL on 2 different occasions; or

- A random glucose test over 200 mg/dL for a person with symptoms of uncontrolled diabetes.

88.     Relator observed, however, that at Scripps Health, providers often submitted claims for DSMT reimbursement with reckless disregard for whether the patient in fact met the foregoing diagnostic criteria. Specifically, Relator Forrest observed that providers would add the CPT code for a diabetes diagnosis despite having taken and recorded the patient's physiological

indicators showing that the patient did not meet the foregoing criteria. Upon receiving these bills, Scripps biller/coders nonetheless submitted claims to Medicare for reimbursement of DSMT services. In all cases, these coders had access to all the relevant patient data to be able to confirm that the diagnosis was correct, and, in at least some cases, coders did in fact determine that the diagnostic classification was incorrect. Nonetheless, these false claims were submitted for reimbursement.

89.    Relator Forrest learned of this practice via email from Analyst Noble dated September 21, 2015, when she saw correspondence between Kelly Barger, Clinical Supervisor of Scripps Diabetes and Prevention Office ("Supervisor Barger") and Analyst Noble. On September 16, 2015, Supervisor Barger wrote to Analyst Noble identifying a patient who "does not have numbers in the diabetes [sic], newly dx [diagnosed] and medicare."

90.    In response, on September 21, 2015, Analyst Noble forwarded this email to Relator Forrest and Senior Director Gaines. Analyst Noble asked Relator Forrest and Senior Director Gaines to "please chime in as to how this should be addressed with the providers."

91.    Later that day, Supervisor Barger wrote to Relator Forrest and others to clarify, "what is my responsibility as clinical supervisor of our ADA recognized diabetes education program in regards to MDs referring patients for diabetes education and us billing mediocre for diabetes education when the diagnostic criteria below does not meet Medicare guidelines. The doctor is giving them this diagnosis of diabetes but the labs do not meet the guidelines. Patient does not have diabetes in Medicare's eyes."

92.    In response, Relator Forrest proposed that Scripps Health should "[c]onsider presenting the patient with an [Advance Beneficiary Notice] for the lab with the reason that Medicare m[a]y not pay due to medical necessity." In other words, Relator proposed, Scripps should notify the patient that the patient may be responsible for the charges because the patient does not qualify for Medicare reimbursement.

93.    In response, however, Supervisor Barger wrote that "Medicare will pay because the diabetes dx code is on the bill. Only during an audit would they discover that the patient did not meet the diagnostic criteria of diabetes. . . . I am not worried about not getting paid by medicare. I am worried about getting into hot water with medicare."

94.    To the best of Relator's knowledge, this practice was widespread and continues. Despite knowledge that certain patients do not qualify for DSMT, Scripps continues to submit false claims for reimbursement. And despite knowledge that it has obtained funds through such

false claims, Scripps has not taken steps to return the fraudulently obtained monies.

### G. Violations of Medicare's Scribe Rules

95.     Relator also learned of widespread violations of Medicare's "scribe" rules. Medicare requires that when a medical assistant scribes for the doctor, *i.e.*, writes up the physician's assessment, the scribe must follow certain Medicare guidelines.

96.     Specifically, the scribed examination must be appropriately documented and attested. The documentation must contain the name, title, and signature of both the scribe and the physician, as well as time and date. Of equal importance, the physician must review the scribed services and note her or his agreement with the accuracy of what has been scribed. Indeed, 42 CFR § 482.2, entitled "Condition of participation: Medical record services," requires that "[a]ll patient medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures."

97.     At Scripps, however, Relator learned that medical assistants merely noted that they had scribed examinations by signing a line on the final page. Scripps kept no evidence, however, that physicians reviewed the scribed notes for accuracy. Moreover, the forms do not note that dates and times that the services and authentication are performed. Relator Forrest is in possession of a copy of such a form completed by Dr. Izadpanah.

98.     As a result, Relator believes that Physicians did not review scribed documentation for accuracy but nonetheless submitted claims based on scribed examinations to government payors for reimbursement.

### H. Retaliatory Constructive Discharge

99.     As discussed *supra*, Relator Forrest sought to correct the fraudulent billing procedures on several occasions. On each occasion, however, her suggestions for ensuring compliance, decreasing fraudulent billings, and returning wrongfully obtained funds, were rebuffed.

100.     These conflicts came to a head when Relator Forrest requested that a compliance bulletin be sent to all Scripps physicians regarding the proper billing of history and physical consultations, discussed *supra*, Section V.D.

101.     On October 20, 2015, Senior Director Gaines wrote to Relator Forrest to say that Relator Forrest's "email H&Ps didn't go over very well across Scripps." She also stated that "it had landed squarely in the laps of [senior Scripps leadership]." Relator Forrest responded that her

1    intent was that the email should be educational, but Senior Director Gaines nonetheless insisted

2    that the two "try to connect."

3        102.    In or around this time, Relator Forrest and Senior Director Gaines spoke

4    personally one-on-one. At this meeting, Senior Director Gaines informed Relator Forrest of her

5    surprise that Relator Forrest was such a "troublemaker." Senior Director Gaines also explained

6    that she had contacted a former colleague of Relator Forrest's from Relator Forrest's previous

7    employment at UCSD, to see if she had been known as a "troublemaker" there. Senior Director

8    Gaines then informed Relator Forrest that she has apologized to those physicians who had

9    received Relator Forrest's compliance bulletin and that Relator Forrest needed to get used to the

10   culture. Finally, Senior Director Gaines stated that she "can't guarantee" that Relator Forrest

     would get "another pass."

11       103.    Relator Forrest understood this statement to mean that she would be fired if she

12   again spoke up against physicians' non-compliance with applicable Medicare and Medi-Cal

13   billing regulations. In other words, Relator Forrest knew that she would either have to acquiesce

     in the submission of false claims, speak up and be fired, or resign.

14       104.    Faced with this Hobson's choice, Relator Forrest resigned. In her resignation

15   letter, Relator Forrest expressed that she was deeply troubled by the "culture" at Scripps, a

16   carefully chosen euphemism for the widespread lack of compliance and the response to her

17   emails regarding compliance issues.

18   **VI.**    **CAUSES OF ACTION**

                                    **COUNT I**
19                          **FEDERAL FALSE CLAIMS ACT**
            **Violations for Causing Submission of False Claims to the United States**
20                          **31 USC § 3729(a)(1)(A)**

21       105.    Relator Suzanne Forrest realleges and incorporates by reference the allegations in

22   all previous paragraphs of this Complaint.

23       106.    Relator seeks relief against Scripps Health under Section 3729(a)(1)(A) of the

24   False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

25       107.    As described above, Scripps Health has knowingly presented, or caused to be

26   presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. §

     3729(a)(1)(A).

27       108.    As a result of these false claims, the United States has been damaged in a

28   substantial amount and continues to be damaged, in an amount yet to be determined.

109.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Scripps and arising from its fraudulent conduct as described herein.

## COUNT II
### FEDERAL FALSE CLAIMS ACT
**Violations for Causing Submission of False Records or Statements Material to False or Fraudulent Claims to the United States**
**31 USC § 3729(a)(1)(B)**

110.    Relator Suzanne Forrest realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

111.    Relator seeks relief against Scripps Health under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

112.    As described above, Scripps Health has knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

113.    As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

114.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Scripps and arising from its fraudulent conduct as described herein.

## COUNT III
### CALIFORNIA FALSE CLAIMS ACT
**Cal. Gov't Code 12651(a)(1)-(2)**

115.    Relator Suzanne Forrest reincorporates herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

116.    This claim is for penalties and treble damages under the California False Claims Act.

117.    By virtue of the acts described above, Scripps Health has presented false claims for payment or approval under Medi-Cal and other California state-funded healthcare programs to officers or employees of the State within the meaning of Cal. Gov't Code § 12651(a)(1). Defendant also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Cal. Gov't Code § 12651(a)(2).

118.    Under California law, the State Medi-Cal program may withhold payment based upon "fraud or willful misrepresentation by a provider."    Cal. Welf. & Inst. Code §

14107.11(a)(2). Fraud is defined as intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person. It includes any act that constitutes fraud under applicable federal or state law." *Id.* § 14043.1(i). Fraud is grounds for suspension from California's Medi-Cal program. *Id.* § 14123.

119.    California's Medi-Cal provider agreement, which providers must sign in order to participate, requires them to agree "to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code." Chapter 7 includes a restriction of Medi-Cal services to those medically necessary to protect life, to prevent significant disability or illness, or to alleviate severe pain. Cal. Welf. & Inst. Code § 14059.5.

120.    Compliance with these provisions is an essential condition for participation in Medi-Cal and other California health programs and for the payment of claims. Claims submitted in violation of these provisions are not eligible for reimbursement. When a provider submits a claim for payment, it is representing or certifying compliance with these conditions. The California State Government would not pay claims that it knew were tainted by false or fraudulent representations of compliance.

121.    The California State Government approved, paid, and continues to approve and pay claims under Medi-Cal that it otherwise would not approve or pay, if not for Scripps's fraudulent billing practices.

122.    Therefore, the State of California has been damaged in an amount to be proven at trial, and is entitled to treble that amount.

123.    Additionally, the State of California is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Scripps and arising from its fraudulent conduct as described herein.

**COUNT IV**
**Violations of the False Claims Act**
**Conspiracy**
**31 U.S.C. § 3729(a)(1)(C)**

124.    Relator Forrest repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

125.    Relator seeks relief against the Defendant under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

126.    As set forth above, the Defendant has conspired with its officers, agents, and

employees to defraud the United States Government by presenting false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1)(C).

127.    Defendant conspired together with their officers, agents, and employees authorizing them to conceal the actions set forth above.

128.    As set forth in the preceding paragraphs, the Defendant has therefore knowingly violated 31 U.S.C. § 3729(a)(1)(C) and has thereby damaged the United States Government by their actions in an amount to be determined at trial.

### COUNT V
### Violations of the False Claims Act
### Reverse False Claims
### 31 U.S.C. § 3729(a)(1)(G)

129.    Relator Forrest repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

130.    Relator seeks relief against the Defendant under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

131.    As set forth above, the Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, and are liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages that the Government sustains because of the act of that person.

132.    The United States Government relied upon these false statements and omissions and has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

### COUNT VI
### Violations of the False Claims Act
### Retaliation Including Wrongful Termination
### 31 U.S.C. § 3730(h)

133.    Relator Forrest repeats and realleges all paragraphs of the allegations herein and incorporates said paragraphs as though set forth herein.

134.    Relator investigated and internally reported the fraudulent conduct alleged in this Complaint to her supervisors, including Senior Director Gaines, Supervisor Bellez, and Director

Coughlin.

135.    The illegal and fraudulent conduct that Relator suspected or knew her superiors were engaging in can form the basis of a FCA claim, as detailed elsewhere in this Complaint.

136.    Defendant Scripps was aware of Relator's investigation and reporting of this conduct, through its agents as discussed above.

137.    Defendant, by and through Senior Director Gaines, discriminated against Relator in retaliation for her investigation and internal reports by informing Relator that if she continued to make such reports, she would face termination.

138.    This retaliation and discrimination was in direct consequence of Relator's protected investigation and reporting of the suspected illegal and fraudulent conduct by Defendant.

139.    The Defendant's harassment and ultimate constructive termination of Relator's employment was in retaliation for her actions in furtherance of an FCA claim and/or other efforts to stop Defendant's conduct in violation of the FCA. Thus, Defendant's harassment and termination of Relator violate 31 U.S.C. § 3730(h).

140.    Relator has been damaged by Defendant's unlawful actions, as described above. Hence, under § 3730(h), Relator is entitled to reinstatement, twice the amount of back pay she has failed to receive as a result of her termination, interest, emotional distress damages, attorney's fees, litigation costs, and other special damages.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Scripps as follows:

a.      That Scripps Health cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

b.      That this Court enter judgment against Scripps Health in an amount equal to three times the amount of damages, as proven at trial, the United States and the State of California, respectively, have sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and Cal. Gov't Code 12651(a)(1)-(2), respectively, plus attorney fees.

c.      That Plaintiff-Relator be awarded the maximum amount allowed pursuant to § 3729(d) of the False Claims Act and Cal. Gov't Code 12652(g);

d.      That, pursuant to § 3729(h) of the FCA, Relator be reinstated in her prior position with Scripps, and further be awarded twice the amount of back pay that she has failed to receive

1    as a result of her termination, along with interest, emotional distress damages, punitive damages,

2    and other special damages;

3           e.      That the Court award such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

4

5    Plaintiff demands trial by jury on all issues so triable.

6    Dated: March 15, 2016                          Respectfully submitted,

7

8                                                   /s/    Edward D. Chapin
                                                    Edward D. Chapin
9                                                   CA Bar No. 53287
                                                    SANFORD HEISLER KIMPEL, LLP
10                                                  501 West Broadway, Suite 515
                                                    San Diego, CA 92101
11                                                  Tel.: (619) 577-4253
                                                    Fax: (619) 577-4250

12                                                  Ross B. Brooks
                                                    N.Y. Bar No. 922122
13                                                  Russell L. Kornblith
                                                    CA Bar No. 289329
14                                                  SANFORD HEISLER KIMPEL, LLP
                                                    1350 Avenue of the Americas, 31st
15                                                  Floor
                                                    New York, NY 10019
16                                                  Tel.: (646) 402-5650
                                                    Fax: (646) 402-5651
17

18                                                  David W. Sanford
                                                    D.C. Bar No. 457933
19                                                  SANFORD HEISLER KIMPEL, LLP
                                                    1666 Connecticut Avenue, N.W., Suite 300
20                                                  Washington, D.C. 20009
                                                    Tel:    (202) 499-5200
21                                                  Fax:    (202) 499-5199
                                                    dsanford@sanfordheisler.com

22

23

24

25

26

27

28